## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ELIZABETH KAVELMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-3114-DJQ |
| | ) | |
| CITY OF LINCOLN, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

Plaintiff Elizabeth Kavelman ("Kavelman") brings this action against her former employer, Defendant City of Lincoln (the "City"), asserting claims of discrimination and retaliation under applicable provisions of the *Rehabilitation Act of 1973*, as amended, 29 U.S.C. §§ 701, *et seq.*, 794 ("RA"); *Illinois Human Rights Act*, 775 ILCS 5/2-101 *et seq.* ("IHRA"); *Americans with Disabilities Act of 1990*, 42 U.S.C. § 12101 *et seq.* (1990) ("ADA"); and the *Equal Pay Act of 1963*, 29 U.S.C., Chapter 8 § 206(d) ("EPA"). (Doc. 24 ¶ 1). Presently before the Court is the City's motion for summary judgment. (Doc. 71). The matter has been fully briefed by the parties. (Docs. 75, 76). For the reasons that follow, the City's motion is granted.

## BACKGROUND

### I.    Procedural History

On September 9, 2022, Kavelman filed her Second Amended Complaint ("SAC") against the City, bringing eleven (11) counts. (Doc. 24).[1] The majority of Kavelman's claims are brought pursuant to provisions of the RA, IHRA, and ADA. Counts I, IV, and VII allege disability discrimination based on the nonrenewal of her employment contract with the City. (Doc. 24 ¶¶ 25–27, 33–35, 41–43). Counts II, V, and VIII allege discrimination against the City for its failure to accommodate Kavelman's disability. (*Id.* ¶¶ 28–29, 36–37, 44–45). Counts III, VI and IX allege that the City retaliated in response to Kavelman's request of accommodations for her disability (*Id.* ¶¶ 30–32, 38–40, 46–48). The remaining claims are brought pursuant to the EPA. Count X alleges that the City engaged in gender discrimination when it paid Kavelman less than male counterparts who previously served in her role. (*Id.* ¶¶ 49–57). Count XI alleges retaliation based upon Kavelman's request to the City for an increase in wage. (*Id.* ¶¶ 58–61).

### II.    Undisputed Facts[2]

Pursuant to an employment contract, Kavelman worked as the "City Administrator" for the City of Lincoln from July 17, 2018, through April 20, 2021. (Doc. 71-1 at 78–79). Her employment contract automatically renewed on its anniversary

---

[1] This Court retains proper jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper pursuant to 28 U.S.C. § 1391(b).

[2] The factual background is primarily drawn from undisputed facts and exhibits in the City's statement of undisputed material facts, Kavelman's response to the City's statement of undisputed material facts, and the City's reply to Kavelman's additional material facts. (*See generally* Docs. 71, 75, 76).

date for additional terms of one (1) year, unless either party gave notice to terminate at least thirty (30) days before the expiration date. (Doc. 75-3 at 4). The contract could also be terminated if "[t]he majority of the governing body vote[d] to terminate [Kavelman] in accordance with Section 1-20-4 of the Lincoln City Code at a properly posted and duly authorized public meeting." (*Id*. at 7).

Before Kavelman's assumption of this role, the title of City Administrator was held by at least two (2) others: Bob Mahrt ("Mahrt") and Clay Johnson ("Johnson"). (Doc. 71-4 at 34).  Mahrt immediately preceded Kavelman in the role, serving since September 11, 2017. (*Id*. at 54). As an independent contractor who was hired through *Gov Temp USA*— a government staffing temp agency—Mahrt was paid a base compensation of $47.25 per hour for hours worked and was expected to work forty (40) hours per week. (*See* Doc. 71-4 at 54–55; *see also* Doc. 71-5 at 16). The parties agree that Mahrt's salary and compensation were not set by the City. (*Id*.). Johnson preceded Mahrt, serving from October 15, 2014, to April 30, 2017. (*Id*. at 50). Johnson was paid a salary of $70,542.50. (Doc. 71-4 at 53).  After Johnson left the role, the City Council did not want to spend the amount of money that was previously paid, as many of the City's aldermen thought the salary paid to Johnson was too large of an amount of money to pay for the City Administrator position going forward. (*See* Doc. 71-4 at 48–49; *see also* Doc. 71-5 at 30–31).

Upon subsequent discussions between the aldermen of the City Council, the starting pay for the City Administrator position was reduced to $50,000, and the duties of the position were curtailed. (*See* Doc. 76 at 16, *citing* Doc. 71 ¶¶ 13–16). This monetary amount of compensation was presented to *all applicants* at the time of Kavelman's

application and onboarding period. (*Id*.). When Kavelman was selected for the position, she spoke with City Aldermen Ron Keller and Tracy Welch on behalf of the City regarding her contractual terms. (Doc. 71-1 at 63–65). Pursuant to her contractual compensation, Kavelman was provided with the pre-determined salary of $50,000 and received benefits—including mileage for travel, life insurance, health insurance and vacation time. (*See* Doc. 71-1 at 26–28; *see also* Doc. 71-3 at 5). Before starting, Kavelman unsuccessfully requested the identical salary given to Johnson. (Doc. 71-1 at 69, 71). Although she was not informed about the substantive changes to the duties and responsibilities of the role as City Administrator before her tenure, it is undisputed that the City Council used the reduction in job duties to justify setting the salary at $50,000 before she was hired. (Doc. 71-2 at 223–24).

When she started in her role as City Administrator, Kavelman's duties included overseeing various projects, including a road project, and various community relations activities on behalf of the City, attending City Council meetings, handling the City budget, supervising the City department heads and writing applications for grants. (*See* Doc. 71-1 at 83–85; *see also* Doc. 71-4 at 18–19, 27). Before 2018, Kavelman had no experience working in the role of City Administrator, but she previously held the position of Mayor of the City of Lincoln from May 2001 to April 2009. (*See* Doc. 71-1 at 76; *see also* Doc. 75-1 ¶ 3). As the City Administrator, Kavelman reported to the Mayor of the City as well as the City Council. (*See* Doc. 71-1 at 82; *see also* Doc. 71-4 at 15). When Kavelman was hired in July 2018, Kavelman's direct supervisor was Mayor Seth Goodman ("Goodman"), but in June 2020 when Goodman resigned, Welch assumed the role of

4

acting-mayor—becoming Kavelman's direct supervisor for the remainder of her time with the City. (*See* Doc. 71-1 at 82; *see also* Doc. 71-5 at 8; Doc. 71-6 at 32).

Kavelman was diagnosed with Hodgkin's Lymphoma before the start of her employment with the City and, in November 2018, she was hospitalized. (*See* Doc. 71-1 at 106, 108–09; *see also* Doc. 75-1 ¶ 4). Because of her admission to the hospital and subsequent treatment, Kavelman took a leave of absence, returning to work for the City of Lincoln in February 2019. (*See* Doc. 71-1 at 115; *see also* Doc. 75-1 ¶¶ 4–5). During her leave of absence, Kavelman was not paid her salary but continued to be paid her perks and stipends, and she was allowed to use her healthcare benefits during this time. (Doc. 71-1 at 112–13).

During the COVID-19 pandemic, Kavelman worked from home from March to June 2020. (Doc. 71-1 at 121).  On March 3, 2020, the City passed an ordinance modifying the duties of the City Administrator.. (*See* Doc. 71-5 at 26; *see also* Doc. 71-4 at 58–59, 61; Doc. 71-7, Ex. 7).[3] The ordinance removed the city administrator's supervisory responsibility over the city department heads and placed that responsibility on the acting mayor. (*Id*.). As a result, Kavelman—as the City Administrator—was no longer the sole individual handling the budget. (*Id*.). Instead, the new system implemented a budgetary committee comprised of four people: (1) the City Administrator; (2) two City Aldermen; and (3) the City Treasurer. (*Id*.). Part of the reason the ordinance was enacted was to provide Kavelman relief in her role, as she had shared with the City Council that she had

---

[3] Filed under seal, Document 71-7 provides reference to the City's Exhibits 7–10.

a lot of work. (Doc. 71-4 at 62). The change was also due to several department heads expressing that it was difficult to work with Kavelman. (*Id*.). Although the two job duties were removed from Kavelman's role, her salary and benefits stayed the same at $50,000. (Doc. 71-1 at 98).

It is undisputed Kavelman told Welch that—per her oncologist's recommendation—she needed an accommodation to work from home given her weakened immune system. (*See* Doc. 75 at 11, *citing* Doc. 75-1 at ¶¶ 13–14). This is evidenced in a July 9, 2020 email that Kavelman sent to Welch—providing the medical recommendation letter from her oncologist. (*See* Doc. 71-1 at 128–29; *see also* Doc. 71-7, Ex. 6 at 2–3). Therein, Kavelman provided Welch with notice of her oncologist's medical opinion—recommending that "[w]orking from home as much as is feasible, is desirable, in order to minimize [Kavelman's] exposure to the public during the current state of the COVID-19 pandemic." (Doc. 71-7, Ex. 6 at 2). Adjoining this medical note from her oncologist, Kavelman provided a lengthy explanation to Welch in the body of the email:

> I wanted to inform you, as I have attached, [my oncologist] really wants me to work from home because I am still immuno-compromised even though he declared me officially in remission yesterday . . . I am very healthy at the present time and that is why this is so difficult and frustrating to explain and to understand . . . I have been torn all day whether or not to give you my doctor's letter. I want to work at City Hall every day if I can stay as isolated as possible . . . [My oncologist] compromised a bit yesterday and asked if I could just come into the office one day per week and work from home the other four days. Is there any way you and I and the City Aldermen can come up with a compromise that I only come into my office on the days I have meetings requiring my presence, or otherwise necessary, and that I wear my mask and gloves during those times? This would only be until the COVID-19 pandemic is still an issue. Please talk with me when you get a few minutes today or tomorrow before you discuss this with anyone from the City Council. I don't want anyone thinking I want special privileges.

That is just the opposite. I want to be back working in my office on a full-time basis as everyone else, as I love my job.

(*Id.* at 3).

The City further takes no issue in accepting as undisputed—yet immaterial—that on or around the same day Kavelman's email was sent, Welch initially refused her request to work from home and told her that she needed to come into the office because other City staff were required to work in-person at the office. (*See* Doc. 75 at 11–12, *citing* Doc. 75-1 ¶ 15). It is also undisputed that Kavelman "repeatedly requested to Mr. Welch that she be provided with an administrative assistant" throughout her employment as the City Administrator. (Doc. 76 at 8–9).

In or around the time of the July 2020 email or after, Kavelman did not discuss her request for accommodations with any of the other members of the City Council. (Doc. 71-2 at 200). Consistent with the language of her initial email, Kavelman articulated that she wanted to work in-person at City Hall, but she also wanted to ensure that she was safe in doing so because of her health status. (*See* Doc. 71-2 at 135; *see also* Doc. 71-4 at 83, 85). She expressed to Welch a need to work from home and that she possessed the equipment that would enable her to do so effectively. (Doc. 71-4 at 86). Subsequent to the email, the parties both concede that Kavelman and Welch met to discuss a set of workplace accommodations the City was willing to provide in response to the threat COVID-19 posed to Kavelman's health status. (*See* Doc. 71-1 at 129–130; *see also* Doc. 71-4 at 82). After meeting and having a conversation about the requested accommodations contained in the July 2020 email, Welch told Kavelman to work from home or the office when she

needed or wanted to depending on her comfort-level. (Doc. 71-4 at 87, 89, 94). Kavelman had access to files that were uploaded to the City server via her home computer and by logging in remotely. (*Id*. at 87, 94). Kavelman was also provided with the flexibility to attend City Council meetings in person or remotely. (*See* Doc. 71-1 at 138; *see also* Doc. 71-4 at 90). When she chose to work in-person at City Hall, Welch instructed Kavelman to keep her office door closed to limit her interactions with other people. (*See* Doc. 71-2 at 139–41; *see also* Doc. 71-4 at 83–84). Welch also instructed the relevant staff that they were not to occupy the same area of the building as Kavelman, and to stay away from her to avoid potential exposure and contraction of the COVID-19 virus. (Doc. 71-4 at 83–84).

In August 2020, Kavelman was given a performance evaluation. (*See* Doc. 71-2 at 147–48; *see also* Doc. 71-7, Ex. 8). As part of that process, a document was provided to City Council members to complete. (Doc. 71-4 at 16–17). The evaluation involved a one-to-five rating scale on a variety of topics and, upon completion, it was submitted to the acting-mayor—a role Welch assumed in June 2020. (*Id*.). This document further included a narrative section that provided space to list and discuss Kavelman's strengths and weaknesses. (*Id*.). Upon completion of the performance evaluations, Welch collated the responses and created a collective document for Kavelman's review. (*Id*.). As a result of Kavelman's performance evaluation, it was noted that she "meets expectations" regarding her job performance. (Doc. 71-6 at 28–29).[4]

---

[4] Kavelman's contract required the completion of a performance review prior to any pay raise. (*See* Doc. 71-6 at 28–29). As a result of her performance evaluation, Kavelman was given a 3% salary raise that was applied retroactively. (*Id*.).

The bulk of criticism within the August 2020 evaluation focused on Kavelman's purported disorganization—highlighting that her office was consistently unkept. (*See* Doc. 71-2 at 153; *see also* Doc. 71-6 at 8, 11; Doc. 71–7, Ex. 8). Welch also told Kavelman that the clutter and state of disorganization in her office was a concern. (*Id*.). The performance evaluation was not the first time that the issue of Kavelman's disorganization was brought to her attention. (Doc. 71-2 at 154–55). During her tenure as City Administrator, her office was in a state of disarray approximately 70% of the time. (*Id*. at 156). Kavelman's office consistently had large volumes of documents and papers laying around, up and until the day that she was no longer employed. (Doc. 71-6 at 16–17).

On February 24, 2021, Kavelman spoke during the executive session of the City Council regarding her role as the City Administrator. (*See* Doc. 71-2 at 158–9; *see also* Doc. 71-7, Exs. 9–10). During the session, Kavelman was asked about a grant that the City was trying to procure for $150,000. (Doc. 71-2 at 159–61). The grant information was submitted incorrectly by Kavelman on day before it was due, resulting in the loss of that monetary amount for the City. (Doc. 71-7, Ex. 10 at 9:00). Kavelman was then excused from the remainder of the executive session so that the City Council could converse regarding the renewal of her employment contract. (*Id*. at 14:06). During their deliberations on the contract renewal, Kavelman's shortfalls in performance as the City Administrator were points of discussion—including her: (1) lack of organization, especially that related to her messy office; (2) lack of communication regarding updates and information on City

projects; and (3) lack of accountability regarding mistakes that she made with the grants that were not prepared in a timely manner. (*See* Doc. 71-7, Ex. 10 at 16:30–24:11).

Although the renewal of Kavelman's employment contract was not decided by a formal vote of the City Council's eight (8) active aldermen, the records of the executive session show a majority consensus of those aldermen "indicate[d] that if [renewing Kavelman's employment contract] were to go to a formal vote," it would not have passed. (*See id.*; *see also* Doc. 71-5 at 35, 37–38).[5] Of the aldermen present at the executive session of the City Council, at least six (6) conveyed their intent of nonrenewal of Kavelman's employment contract—including: (1) Alderman Steve Parrott; (2) Alderman Jeff Hoinacki; (3) Alderman Ron Keller; (4) Alderman Kevin Bateman; (5) Alderman Ron Fleshman; and (6) Alderman Sam Downs. (*See* Doc. 71-7, Ex. 10 at 16:30, 19:30, 20:57, 23:00, 23:18, 23:49, 24:11). Ultimately, the City Council chose to provide Kavelman with thirty (30) day notice that her contract would not be renewed. (*See* Doc. 71-2 at 165; *see also* Doc. 71-8 at 2). The discrete nature of this decision was discussed during the executive session as an alternative means to provide Kavelman adequate notice of nonrenewal

---

[5] District courts may take judicial notice of matters of public record such as "state statutes, city charters, and city ordinances." *See Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir.1977); *see also Henson v. CSC Credit Serv.*, 29 F.3d 280, 284 (7th Cir.1994) (holding that a court may take judicial notice of matters of public record). Here, the Court judicially notices the municipal code as codified by the City of Lincoln, providing: "The City Council shall consist of the Mayor and two Aldermen from each ward." *See* Lincoln City Code, § 1-6-1 (*recodifying* 1960 Code § 1.06.010). The City is comprised of four (4) wards—suggesting a maximum of eight (8) city alderman and one (1) active-mayor may serve on a City Council at a given time. *Id.* at § 1-15-1 (*citing* Ord. 2012-754; *as amended by* Ord. No. 2022-985). Here, as Welch served as an acting-mayor concurrently with his duties as City Alderman between June 2020 and May 2021—the Court takes notice that a maximum of eight (8) individuals comprised the City Council during the February 2021 executive session.

without risk of reputational damage or embarrassment resulting from a public dismissal. (*See* Doc. 71-7, Ex. 10 at 1:19:04).

Although unclear whether the conversation took place before or after the executive session in February 2021, Jonette Tibbs ("Tibbs")—a former alderman who retired in 2019—had a phone conversation with acting-mayor Welch regarding Kavelman. (Doc. 75-2 at 1–2) ("Tibbs' Affidavit"). During that conversation, Tibbs expressed her support for Kavelman to be retained by the City "because she was very important." (*Id*.). Welch responded that Kavelman "ha[d] been very good," but also that she had been "a very sick woman." (*Id*.).

Welch provided Kavelman with the City Council's notice of nonrenewal—assuring her that she would be welcome to apply for other positions as they become available and would be fairly considered among the other applicants. (Doc. 71-2 at 167–68). In the interim, Kavelman continued her job duties and functions, including taking part in the City's budgetary process in March and April of 2021. (*Id*. at 171). On April 9, 2021, Kavelman was placed on paid administrative leave through the end of her contract with the City. (*Id*. at 181).

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The district court's role

in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In making this determination, the court must construe record evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Even so, "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013). Thus, "the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (citations omitted). In other words, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (citations omitted). Summary judgment motions "are usually ... decided on documentary evidence." *Anderson,* 477 U.S. at 251 (internal quotations omitted).

Submission of supporting materials to establish material issues of fact "in a summary judgment proceeding 'must be established through one of the vehicles designed to ensure reliability and veracity—depositions, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits,

12

they must be identified by affidavit or otherwise made admissible in evidence.'" *Friedel v. Madison,* 832 F.2d 965, 970 (7th Cir. 1987) (citations omitted). Although it is not a judicial function to resolve factual disputes, to weigh conflicting evidence, or to assess credibility of evidence at this stage, district courts can make preliminary, nonbinding determinations of what is or is not admissible evidence. *See* Fed. R. Civ. P. 56(c)(2).

## II.     Evidentiary Rulings

The Court first must resolve some outstanding evidentiary objections. The admissibility of evidence presents as a threshold question because the Court may only consider admissible evidence when making materiality assessments. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (inadmissible evidence will not overcome a motion for summary judgment); *see also Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial).

Kavelman presents thirty (30) additional statements of material fact in her response brief consistent with Local Rule 7.1(D)(2)(B)(5). (Doc. 75 at 10–14). The City's reply brief, in support of its motion, addresses each in sequential fashion. (Doc. 76 at 1–11). Independent of arguments asserting a lack of materiality, the City asks the Court to exclude several of Kavelman's additional statements, alleging several are inadmissible hearsay, lack sufficient foundation, are irrelevant to the summary judgment inquiry, or are otherwise contradicted by prior sworn testimony. (*Id.*).

Evidentiary objections such as these present a "quandary" to district courts because the proponent of the evidence often has no natural opportunity to respond. *See*

*Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595–96 (7th Cir. 2017). In *Ennin*, as an issue of first impression, the Seventh Circuit found that a nonmovant had waived argument as to the admissibility of evidence introduced at the summary judgment stage. *Id*. Despite being permitted by local rule to file a sur-reply in response to the employer's evidentiary objections to the summary judgment record, the nonmovant neglected to pursue this opportunity in support of admission. *Id*. at 596 (*citing* S.D. Ind. L.R. 56-1(d)). "That is the very essence of waiver." *Id*. But where no local rule provides a "meaningful opportunity to be heard on the evidentiary issue in the district court," the Seventh Circuit has allowed a nonmovant to present evidentiary objections for the first time on appeal—encouraging district courts to be mindful of this due process concern:

> In managing summary judgment practice in their courts, district courts need to ensure that they do not base their decisions on issues raised in such a manner that the losing party never had a real chance to respond. If a district court does not provide an opportunity to be heard, our doors will be open to consider those arguments.

*See Smith v. Bray*, 681 F.3d 888, 903 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters.*, Inc., 834 F.3d 760 (7th Cir. 2016); *see, e.g.*, *R.J. Corman Derailment Services, LLC v. Int'l Union of Operating Engineers, Loc. 150*, 335 F.3d 643, 650 (7th Cir. 2003) (reversing summary judgment granted without notice and opportunity to respond).

Akin to the district court in *Smith*, the local rules for civil practice in the Central District of Illinois provided no opportunity for Kavelman to rebut the City's evidentiary objections made for the first time in the reply brief. In the past, when faced with this due process dilemma, this Court has endeavored to consider all evidence proffered—so long

14

as that evidence is not "plainly inadmissible" and is "supported and based on personal knowledge." *Moore v. Illinois Bell Tel. Co., LLC*, No. 4:20-CV-04124-SLD-JEH, 2023 WL 3516053, at *4 (C.D. Ill. May 17, 2023) ("Thus, in the interest of judicial economy and mindful of this case's summary judgment posture, the Court will assume that the additional material facts introduced by Moore, so long as they are supported and based on personal knowledge, are admissible."). Accordingly, unless found to be plainly inadmissible or otherwise lacking in foundation, this Court will presume Kavelman's additional fact-statements may be considered for purposes of summary judgment.

### A. Hearsay Statements

In presentation of the first set of evidentiary objections, the City chiefly invokes Rules 801 and 802 of the Federal Rules of Evidence—alleging each of those statements is improperly dependent upon inadmissible hearsay. (Doc. 76 at 2, 5–6, 10). The Court agrees. Provided below in sequential order, the following additional statements of material fact are excluded for purposes of summary judgment:

> **Additional Statement #5**: In June of 2020, Plaintiff's doctor asked her if she was still working from home and she told him no, after which her doctor told Plaintiff he wanted her to work from home due to Plaintiff's compromised immune system.
> . . .
> **Additional Statement #14:** Plaintiff's doctor reprimanded her and indicated that, in the event Plaintiff contracted COVID-19, her chances of dying from the infection would likely be 50 percent.
> . . .
> **Additional Statement #15:** In or around October of 2020, Plaintiff's doctor asked Plaintiff if she was working from home, and she indicated that she was working in the office since her employer required it.
> . . .

15

> **Additional Statement #26:** In February of 2021, former City Alderman Jonnette Tibbs reached out to Mr. Welch and asked him if he planned to keep Plaintiff at the City.
> . . .
>
> **Additional Statement #27:** Mr. Welch responded that Plaintiff had been an excellent employee before she got sick and that he planned to get rid of Plaintiff before she got sick again.

(*See* Doc. 75 at 11–13, *citing* Doc. 75-1 ¶¶ 7, 16; *see also* Doc. 71-1 at 48:7–16).

"Hearsay," in its simplest terms, is an out-of-court statement offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). Unless covered by applicable exception or exemption, hearsay evidence is inadmissible and may not be relied upon to oppose a motion for summary judgment. *See* Fed. R. Evid. 801(d), 802–804; *see also Gunville*, 583 F.3d at 985; *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial); *Bombard*, 92 F.3d at 562 (inadmissible hearsay from an affidavit or deposition will not suffice to overcome a motion for summary judgment).

Here, Additional Statements #5, #14, and #15 constitute classic hearsay. Kavelman offers each statement for the truthfulness of the physician's instructions, reprimand, and other medical warnings within his statements—insisting her disability required that she work from home on a full-time basis lest she not face substantial risk of death from COVID-19 infection. (Doc. 75 at 11–13). The only evidence cited by Kavelman in support of these additional statements is her own affidavit. (*See* Doc. 75-1 ¶¶ 7, 14, 16).

While self-serving affidavits can "indeed be a legitimate method of introducing facts on summary judgment," a party's effort to thwart summary judgment must also comply with Federal Rule of Civil Procedure 56(e)—proscribing that a summary judgment affidavit must "be made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Nothing about this rule, however, intimates that inadmissible hearsay statements from Kavelman's physician transform into admissible evidence for purposes of summary judgment merely because it was represented in Kavelman's affidavit. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) ("Personal knowledge can include reasonable inferences, but it does not include speculating as to an employer's state of mind, or other intuitions, hunches, or rumors."). Thus, it matters not whether Kavelman represents these statements made by her physician in her deposition testimony or by affidavit. Throughout this threshold inquiry, the Court's focus remains on the admissibility of evidence in evaluation of content—not form. *See Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016) ("The evidence need not be *admissible in form*, but must be *admissible in content*, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial") (emphasis added). The Court thus sustains the City's objections as to Additional Statements #5, #14, and #15.

Next, in support of Additional Statements #26 and #27, Kavelman cites to her testimony, wherein she represents communications made between Mayor Welch and Jonette Tibbs:

> Well, she had spoken with the mayor, Tracey Welch prior to -
> - it was in January or February of 2021. She said she
> approached him and asked if he was going to keep me on.
> And he – he said, well, I had been an excellent employee
> before I got sick with my cancer and after that I wasn't quite
> right and he thought I'd get sick again so I was going to get
> rid of me prior to that.

(*See* Doc. 71-1 at 48:7–16). This testimony contains two levels of hearsay—commonly referred to as "double hearsay" or "hearsay-within-hearsay." *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); *see also United States v. Severson*, 49 F.3d 268, 271 (7th Cir. 1995) (requiring that "both levels of hearsay must come within exceptions to the hearsay rule for hearsay within hearsay to be admissible.").

Here, for these statements be admissible, both the "inner layer"—Welch's statements to Tibbs—and "outer layer"—Tibbs recitation of those statements to Kavelman—must fall within an applicable hearsay exception for the Court to consider the fact-statements on summary judgment. As to the inner-layer, the Court observes that Welch was operating as an agent for the City and served in a representative capacity at the time of his conversation with Tibbs, providing grounds for admission as an opposing-party statement. *See* Fed. R. Evid. 801(d)(2)(A) (providing that a "statement [that] is offered against an opposing party and ... was made by the party in an individual or representative capacity" is not hearsay); *cf. Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 825, n. 4 (7th Cir. 1999) (similarly finding the "inner-layer" of hearsay exempted under Rule 801(d)(2)(A)). Even so, the second—"outer"—layer is provided no safe harbor from exclusion under Rule 802. As these representations are offered as truthful statements

made by Tibbs to Kavelman, the classic hearsay designation applies, and the testimony is inadmissible for the purposes of summary judgment.

Although the Court bars the admission of Additional Statements #26 and #27, it does acknowledge and considers the undisputed statements of fact as represented in Tibbs' Affidavit. (Doc. 75-2 at 1). Tibbs attested that "shortly after" Welch took office as acting-mayor, she spoke with him about Kavelman and that, during this conversation, she recommended that Welch not "get rid of" Kavelman "because she was very important." (*Id.*). Welch responded that Kavelman "has been very good, but [she] has been a very sick woman." (*Id.*). These statements are undisputed. (Doc. 75-2 at 1).[6]

### B. Personal Knowledge

The City next invokes Rule 602 in objection to several of Kavelman's additional statements of material fact—claiming each statement is inadequately grounded in sufficient foundation or are otherwise irrelevant to the Court's forthcoming inquiry on summary judgment. (Doc. 76 at 3–4, 9). Provided in Kavelman's response, this set of additional statements of material fact includes:

> **Additional Statement #2:** During Plaintiff's tenure as mayor of the City of Lincoln, Plaintiff performed the job duties of the city administrator.
> . . .

---

[6] Until assumption of elected office as full-time mayor on May 1, 2021, Welch served as "acting-mayor" or "part-time mayor" from June 2020—when Goodman resigned as mayor. (Doc. 71-4 at 11). As it remains undisputed, Tibbs attests that her conversation with Welch took place "shortly after" Welch took office as "acting-mayor" of the City—neglecting to provide a specific or approximate set of dates. (Doc. 75-2 at 1). Kavelman represents that a conversation took place between Tibbs and Welch in "January or February 2021," a period "prior to" Welch taking office. (*See* Doc. 71-1 at 48:7–16). The Court's decision to sustain the City's objection to Additional Statements #26 and #27 has no impact on the admission of the assertions found in the Tibbs' Affidavit. On approach of the summary judgment inquiry, the Court will review statements within the Tibbs' Affidavit as uncontested statements as admissible statements of undisputed fact—whether those statements are material is reserved for further discussion.

**Additional Statement #6:** The risk and danger of COVID-19 infection was heightened due to Plaintiff's prior need for an HLA platelet transfusion in early November or December of 2018.
. . .
**Additional Statement #7:** Due to Plaintiff's Native American heritage, there was great difficulty in locating a match for the transfusion.
. . .
**Additional Statement #10:** In the event Plaintiff contracted COVID-19 and needed another HLA platelet transfusion, locating a match would have been almost impossible, which likely would have resulted in her imminent death.
. . .
**Additional Statement #23:** Former city administrators Clay Johnson and Robert Mahrt were each provided with administrative assistants.
. . .
**Additional Statement #24:** Mr. Welch denied Plaintiff's requests for an administrative assistant, even though, with the assignment of the Fifth Street Road Project, Plaintiff's workload was greater than Mr. Johnson's or Mr. Marht's.
. . .
**Additional Statement #25:** In response to Plaintiff's requests for an administrative assistant and to work from home, the City removed some of her job duties.

(*See* Doc. 75 at 10–13, *citing* Doc. 75-1 ¶¶ 3, 8–12, 15, 24). But the Court cannot square how, for example, Additional Statements #6 and #10 are adequately supported with evidence of personal knowledge. Each statement cites to her own affidavit—providing only conclusory assertions on topics of medical care and the speculative risk-levels of contracting communicable disease; such knowledge appears outside her competence as a prospective lay witness at trial. Her assertion that the risk and danger of contracting COVID-19 was heightened and would likely result in "imminent death," sounds more like a medical hypothesis that demands additional expertise. (*See* Doc. 75 at 11, *citing* Doc. 71-5 at ¶¶ 8, 12). The Court therefore sustains the City's objections to Additional Statements #6 and #10.

Additional Statements #2, #23, #24, and #25, also lack sufficient foundation to be admissible on summary judgment. For example, Kavelman does not adequately substantiate the contention that, during her tenure as Mayor of the City of Lincoln, she performed the job duties of the City Administrator—only that she was, in fact, the Mayor. (Doc. 75-1 ¶ 3). Her claims that the City removed job because of of her requests for an administrative assistant are also unsupported by the record. (*Id.* ¶ 22). Nor does Kavelman sufficiently demonstrate her personal knowledge as to the workload of the individuals who served in similar roles prior to her onboarding in July 2018—failing to produce evidence outside of her own speculation to that account. (*Id.* ¶¶ 23, 24). These statements of Kavelman's subjective belief are, therefore, improperly asserted without additional foundation. *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact").

Although self-serving affidavits are not to be rendered invaluable, they require adequate foundation. *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 850 (7th Cir. 2015) (affirming the district court's disregard of "summary assertion[s] of differential treatment" that "g[a]ve[ ] the reader no reason to believe that [the affiant] has the requisite personal knowledge"). In suggesting her workload was greater than others, Kavelman provides no references to documentary evidence or admissions that would suggest she holds personal knowledge of the comparative workloads of these prior City Administrators. *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (affirming the district court's disregard of affiants' "conclusory statements," which failed to

21

"demonstrate[ ], with sufficient particularity, that they actually knew" of unequal treatment). Accordingly, the Court sustains the City's objection to Additional Statements #2, #23, #24, and #25.

Finally, despite limited facts provided in her affidavit to ground Additional Statement #7, the Court does find that Kavelman holds personal knowledge sufficient to articulate how her personal experience as a woman of Native American heritage impacted her access to medical care during this period of disability. (*See* Doc. 75 at 11, *citing* Doc. 75-1 ¶ 9). Regardless, this fact-statement appears far attenuated from the elements of the claims brought in this action. It does not materially inform whether Kavelman has either been discriminated against or retaliated against in her role as a City Administrator on the basis of her protected disability status, nor does it lend itself to resolving whether the City's accommodations request were unreasonable in the form as offered to Kavelman. The nexus between this fact-statement and the elements of this action remains unclear, but in the "interest of judicial economy," and in remaining "mindful of this case's summary judgment posture," the Court will assume that this fact-statement is admissible. *See Moore*, 4:20-CV-04124-SLD-JEH, 2023 WL 3516053, at *4. When admitted *arguendo*, the fact ultimately plays no dispositive role in the Court's summary judgment inquiry. Thus, the Court overrules the City's objection to Additional Statement #7.

### C. Sham-Affidavit Rule

Objecting to the admission of the remaining fact-statements of controversy, the City asks this Court to enforce the "sham-affidavit rule" to exclude portions of

Kavelman's affidavit from the summary judgment assessment. (Doc. 76 at 6–8). In the Seventh Circuit, "the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316–17 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)).

In determination of whether this rule compels partial exclusion of Kavelman's affidavit, the Court compares her most recent assertions with her past testimony in this case. First, by incorporating her affidavit as evidentiary support—dated January 5, 2025—Kavelman asserts the following additional statements of material fact now subject to the Court's threshold question of admissibility:

> **Additional Statement #16**: From March to December of 2020, Plaintiff had at least four conversations with Mr. Welch, when she requested to work full-time from home.
> . . .
> **Additional Statement #17**: During these conversations, Mr. Welch sometimes said Plaintiff could work from home, then changed his mind and told her she had to work in the office.
> . . .
> **Additional Statement #18**: During one of the above-referenced conversations, Mr. Welch told Plaintiff she could attend City meetings via Zoom video conference, at her discretion.
> . . .
> **Additional Statement #19**: Despite Mr. Welch's assurance that Plaintiff could attend City meetings via Zoom, when Plaintiff attempted to attend a meeting via Zoom, Mr. Welch repeatedly refused to admit her into the meetings and left [Kavelman] in the Zoom waiting room.
> . . .
> **Additional Statement #20**: Plaintiff attended City meetings in person after Mr. Welch repeatedly refused to admit her into the Zoom meetings.

(*See* Doc. 75 at 6–8; *see also* Doc. 75-1 ¶¶ 17, 18, 19, 20). These assertions are rather detailed, and are notably inconsistent with Kavelman's September 28, 2024, sworn deposition testimony—as provided in relevant portion:

> **Counselor Eberhart (Q):** Is it fair to say that you would have preferred to work in the office?
>
> **Plaintiff Kavelman (A):** Yes. Yes. That – right. Yes. But, like I said, I should have followed my doctor's orders.
>
> **Q:** Okay. So is it your testimony that you went against your doctor's orders because you wanted to work in the office every day?
>
> **A:** No, it was I was concerned about my job, too. That's not just saying I wanted to work there. But, no, I love my job. But there's always different circumstances behind the scene.
>
> **Q:** All right. Now, you said you believed that you spoke with Mayor Welch in person about this as well, correct?
>
> **A:** I'm pretty sure I brought it up because I wanted to have an answer.
> . . .
> **Q:** Did Mayor Welch ever tell you that it was in your discretion what meetings and activities on behalf of the City that you would attend in person?
>
> **A:** Um, I'm guess—I think he might have . . .
> . . .
> **Q:** So then you would agree that Mayor Welch did tell you that it was in your discretion if you wanted to attend these meetings or activities in person; is that correct?
> . . .
> **A:** I say, yes, he would, but I – he didn't mean it. It would mean that I still didn't find out what went on. So I was being excluded.
> . . .
> **Q:** And did you ever ask Mayor Welch to work from home full-time?
>
> **A**: I believe I did.
>
> **Q:** And when did you ask him?
>
> **A:** I'm thinking it was when – after I had seen Dr. Kahl on – he gave me that letter on July 8th. I was thinking I did ask him that.
>
> **Q:** And you do recall how you had that communication? Was it via email or in person?

**A:** I probably put an email to have it in writing, but I don't – I don't recall that. I don't know. I mean, that was always my wish. I needed to be at the office, but I also needed to watch my health.

**Q:** Okay. So fair to say you don't recall one way or the other whether you asked Mayor Welch to work from home full-time?

**A:** I'm thinking I did, but I cannot – I can't recall.

(Doc. 71-2 at 136:8–141:22).

And when placed against the sole documentary evidence available in the record that represents Kavelman's July 2020 email request for accommodations, the assertions provided in her subsequent affidavit are also misaligned — suggesting Kavelman *actually* requested, and her doctor recommended, a hybrid model of work. The record also suggests that she preferred to return to in-person working as soon as her health would allow. (*See generally* Doc. 71-7, Ex. 6). Indeed, Kavelman does not deny that in July 2020 she "want[ed] to work at City Hall every day if [she could] stay as isolated as possible" and wished to seek a "compromise [where she would] only come into [her] office on the days [she had] meetings requiring [her] presence, or otherwise necessary," and was willing to take all precautions necessary to do so. (*Id.*).

The sham-affidavit rule applies to contradictions between an assertion in a party's summary-judgment affidavit and the party's prior sworn testimony — as is exactly the circumstance in the present case. The organizing principle of this rule is simple: a *genuine* issue of material fact cannot be conjured out of nothing. *Hale*, 959 F.3d at 316–17 (clarifying that the rule was adopted "to weed out unfounded claims, specious denials, and sham defenses") (citing *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir. 1985));

*but see Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015) (cautioning that the sham-affidavit rule "must be applied with great care ... because summary judgment is not a tool for deciding questions of credibility"). Like the *Hale* court's concerns over the materiality of an affidavit's inconsistencies to the ultimate resolution of the claim or defense elements at issue, *cf.* 959 F.3d at 316–17, hereto this Court observes that Kavelman's contradictions do not concern details at issue between the parties merely of minor importance. Rather, the subject matter goes to the heart of the inquiry as to her claims against the City for their purported failure to engage in an interactive process in the development and offer of reasonable accommodations to address her disability.

Moreover, none of the applicable exceptions under this rule provide safe-harbor for Kavelman's affidavit. Her affidavit "did not clarify ambiguous or confusing deposition testimony," nor has she has convincingly "demonstrated that the relevant deposition statements were mistaken." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996); *see also Russell v. Acme-Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995). Further, as it pertains to these relevant sections, her affidavit contains no newly discovered evidence outside of her own speculation. *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 520 (7th Cir. 1988).

The Court, therefore, sustains the City's objections to Additional Statements #16 through #20.

## III.    Disability-Discrimination Claims

Kavelman's Second Amended Complaint contains two sets of claims under a theory of disability discrimination—both of which are grounded under applicable

26

provisions of the RA, IHRA, and ADA. (*See generally* Doc. 24). First, under Counts I, IV, and VII, Kavelman alleges the City chose nonrenewal of her contract based on her disability. (*See* Doc. 71 at 1–2; *see also* Doc. 24 ¶¶ 25–27, 33–35, 41–43). Second, as for Counts II, V, and VIII, Kavelman contends the City engaged in discrimination when it failed to provide reasonable accommodations for her disability. (*See* Doc. 71 at 1–2; *see also* Doc. 24, ¶¶ 28–29, 36–37, 44–45).

On review of summary judgment as for each set of counts, the Court must apply the ADA-framework. *Jackson v. City of Chicago*, 414 F.3d 806, 810–11 (7th Cir. 2005) ("[T]o determine whether the [RA] has been violated in the employment context, we refer to the provisions and standards of the [ADA]."); *see also Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999) (applying ADA-framework to RA claims); *McKay v. Vitas Healthcare Corp. of Ill.*, 232 F. Supp. 3d 1038, 1043 (N.D. Ill. 2017) ("[C]laims brought under the IHRA are governed by the same standards as claims under parallel federal discrimination statutes.").

### A.  Nonrenewal of the Employment Contract (Counts I, IV, and VII)

Under the ADA, no covered entity "shall discriminate against a qualified individual on the *basis of disability* in regard to job application procedures, the hiring, advancement, or *discharge of employees*, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). Accordingly, for Kavelman's Counts I, IV, and VII to survive summary judgment, she must show that: (1) she is disabled; (2) she is qualified to perform the job's essential function either with or without reasonable accommodation; and (3) she suffered adverse

employment action because of her disability. *Gogos v. AMS Mech. Sys., Inc.,* 737 F.3d 1170, 1172 (7th Cir. 2013).

Here, the City concedes any dispute over the first two elements of this inquiry—alleging instead that Kavelman has failed to adequately demonstrate a causal nexus between the "adverse action" (nonrenewal of her employment contract) and her disability under the third element. (Doc. 71 at 15–18). Kavelman is tasked to show the City's discriminatory motive behind the nonrenewal decision. Direct "smoking gun" evidence of discriminatory intent is generally difficult to come by. *United States Postal Serv. Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Kavelman is, however, entitled to rely upon circumstantial evidence—including:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Monroe v. Indiana Dep't of Transp.,* 871 F.3d 495, 504 (7th Cir. 2017). Regardless of the type of evidence presented, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Gnutek v. Ill. Gaming Bd.,* 80 F.4th 820, 824 (7th Cir. 2023) (citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 361 (2013)).

In her response brief, Kavelman first suggests that the City's nonrenewal of her contract suggests a material fact that remains disputed between the parties—pointing to

28

evidence that she asserts is indicative of a pretextual termination (Doc. 75 at 21). In support of her position, she asserts that her prior, positive performance evaluation from August 2020 tends to show that the City's subsequent decision of nonrenewal is either illegitimate, implausible, or inconsistent. *Id.* The Court disagrees.

To begin, the mere existence of a prior, positive record or employment evaluation is insufficient to survive summary judgment; instead, the critical question is whether an employee was "meeting an employer's legitimate employment expectations"—requiring focus not on the "employee's past performance," but whether "the employee was performing well at the time of [her] termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Under this framework, Kavelman's performance in the role suggests that she was on a downward trajectory from her August 2020 evaluation to the City Council's ultimate decision not to renew her employment contract in March 2021.

More importantly, it remains undisputed that a majority consensus of the aldermen clearly expressed their intent not to renew Kavelman's employment contract during the City Council's executive session on February 24, 2021. (Doc. 71 at 11–12). Six (6) of the eight (8) aldermen supported nonrenewal of the contract due to Kavelman's poor-performance and lack of attention to detail on several projects of importance that resulted in loss of funds to the City from grant-programs. (Doc. 71 at 11–12). The City represents the following set of statements in its motion of which Kavelman admits are both material and undisputed:

- City Alderman Steve Parrott stated he would not be voting for renewal Kavelman's contract—noting how her office was unorganized and that much of the time he does not understand or know what Kavelman is talking about in

City meetings because she is just "all over the place." (Docs. 71-7, Ex. 10 at 16:30).

- City Alderman Jeff Hoinacki stated that Kavelman does not communicate well as to her role and ongoing projects, and that the City needs someone who is able to give updates on City issues. (*Id*. at 19:30).

- City Alderman Ron Keller made known his intent to vote against Kavelman's renewal—noting that the City had parceled out some of her job duties to give her more time for other city administrator responsibilities, but that there had been no signs of improvement with her work performance since. (*Id*. at 20:57). He also believed that Kavelman was not forthcoming in the answers she provided regarding the grant-related issue that cost the City $150,000. (*Id*.).

- City Alderman Kevin Bateman stated that he would not vote for renewal of Kavelman's contract. (*Id*. at 23:00, 24:11). He discussed an incident where Kavelman accused the treasurer of embezzling money and that she sent an inappropriate letter involving Welch—suggesting that, when Kavelman is less involved with City projects, the smoother things run. (*Id*.).

- City Alderman Ron Fleshman stated that he would not be in favor of renewing Kavelman's contract, discussing how her organizational skills are not great and that items that the City originally wanted her to take care of had to be taken away from her. (*Id*. at 23:18).

- City Alderman Sam Downs stated that he would vote not to renew Kavelman's contract. (*Id*. at 23:49). Although he liked Kavelman and thought she was a great person, he noted that she was unsuccessful in her role. (*Id*.).

Beyond Kavelman's admission that these statements were articulated accurately and are material on summary judgment, she presents no evidence that the reasons set forth by the six (6) aldermen are false. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) ("In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge."); *see also Burks v. Wisconsin Dep't of Transp.,* 464 F.3d 744 (7th Cir. 2006) (absent plaintiff's presentation of evidence showing error or dishonesty in rationale

supporting termination, other evidence of satisfactory job performance is insufficient to create a genuine issue of material fact); *Miller v. Univ. of Chicago,* No. 05-cv-01663, 2007 WL 317028, at *9 (N.D. Ill. Jan. 29, 2007) (granting summary judgment where no evidence suggested that the termination of employment was motivated by plaintiff's protected class). The comments above show that Kavelman's poor performance and organization—not her protected status as a disabled worker—led the City Council to reach a majority consensus in support of contract-nonrenewal.

Kavelman also asserts that Johnson and Marht were treated more favorably than her—invoking an argument under the similarly-situated comparator doctrine. (Doc. 75 at 21) ("With regard to similarly situated employees, the evidence shows that Mr. Johnson and Mr. Marht were treated more favorably than Plaintiff."). But Kavelman provides no specific citation to the record, nor instructs the Court on any controlling law in her favor on this point. *Bombard*, 92 F.3d at 562; *see also United States v. Lanzotti,* 205 F.3d 951, 957 (7th Cir. 2000) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority . . . ."). This argument is simply undeveloped, and it is not the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment." *Id.*

Further, there is little indication of suspicious timing such that a juror could reasonably infer discrimination in the City's decision of nonrenewal. For a suspicious-timing argument to give rise to an inference of causation in this circuit, there must be adequate demonstration that "an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to

impose the adverse action knew of the protected conduct." *Lalvani v. Cook Cnty.,* 269 F.3d 785, 790 (7th Cir. 2001). Although there can be no set legal rule for determining whether an adverse employment action falls "close on the heels" of protected activity because such a determination "depends on context." *Loudermilk,* 636 F.3d at 315 ("The closer two events are, the more likely that the first caused the second.").

Under the present facts, however, there is no close showing between Kavelman's protected activity and the City's adverse action. The time between Kavelman's cancer diagnosis and the City Council's notice of nonrenewal of her contract amounts to nearly two and a half years—from November 2018 through March 2021. And courts often afford no more than a few days to elapse between the protected activity and the adverse action to find an inference of causation to be drawn solely on the basis of suspicious timing. *Compare Casna v. City of Loves Park,* 574 F.3d 420, 422–23, 427 (7th Cir. 2009) (holding that a one-day time period between the employee's complaint and her supervisor's recommendation to fire her was sufficient), *and McClendon v. Ind. Sugars Inc.,* 108 F.3d 789, 796–97 (7th Cir. 1997) (holding that a two- to three-day time period between the employee's complaint and his discharge was sufficient), *with Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (four-to-five-week gap not suspicious); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (three-month gap not independently suspicious); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five-month gap not independently suspicious).

Arguably, the timing of a conversation between Tibbs and Welch that took place "shortly after" Welch took office as "acting mayor"—whether this conversation took

place in mid-to-late 2020 or in the beginning of 2021—could be considered suspicious. (Doc. 75-2). Even so, it remains undisputed that a clear majority of the City Council expressed their clear intent not to renew Kavelman's employment contract. No argument as to the suspicious timing or substance of the conversation between Tibbs and Welch could provide a reasonable juror to infer a causal-link between Kavelman's disability and the nonrenewal of her employment contract.

Nor has Kavelman shown that Welch relayed anything about her disability to the City Council that would have persuaded the formation of such consensus by pretext. In fact, the City Alderman even sought to clarify the propriety of Welch's vote because of his status as Kavelman's direct supervisor—questioning whether Welch would be entitled to cast a vote on the nonrenewal of the employment contract had a vote by the City Council been taken during a public session. (Doc. 71-7, Ex. 10 at 1:29:40–1:30:15). Although Welch insisted that his vote would indeed count in that decision, he represents just one (1) of eight (8) aldermen permitted to vote on matters before the City Council. (*Id*.). In no way does the record provide—nor does Welch himself suggest—that he was in a unilateral position to "terminate" Kavelman's contract. Nor does the record suggest that the City Council's majority-consensus was either pretextually grounded or improperly influenced.[7]

---

[7] In *arguendo*, the Court also notes that it would come to the same conclusion if all the evidentiary rulings provided in Section II were made in favor of Kavelman's positions and such evidence was admitted for purposes of summary judgment on the discrimination claims. If Welch was the sole decision-maker in the nonrenewal of her contract, those facts as represented through Kavelman's Additional Statements of fact would render summary judgment in favor of the City inappropriate. However, Kavelman has not presented evidence showing that the six (6) aldermen comprising the City Council who expressed their

For these reasons, Kavelman has failed to carry her burden to establish a *prima facie* case of discrimination—neglecting to demonstrate sufficient evidence such that a reasonable juror could conclude a "causal-link" exists between her disability and the City's nonrenewal of her employment contract. *Gnutek*, 80 F.4th at 824 (citing *Nassar*, 570 U.S. at 361). The City's motion is granted as to Counts I, IV, and VII.

### B.  Failure to Accommodate (Counts II, V, and VIII)

Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). To prevail on Counts II, V, and VIII,  Kavelman must show three things: (1) she had "physical or mental limitations" known by the City, (2) she was "an otherwise qualified individual with a disability," and (3) the City failed to reasonably accommodate her limitations. *Swain v. Wormuth*, 41 F.4th 892, 897 (7th Cir. 2022)*; see also Sansone v. Brennan*, 917 F.3d 975, 979 (7th Cir. 2019). It remains uncontroverted that Kavelman meets the first and second *prima facie* elements.

"Relevant to—and sometimes determinative of—the third element is the employer and employee's respective cooperation in an 'interactive process to determine a reasonable accommodation.'" *Sansone*, 917 F.3d at 979 (citing *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998)). Once an employer is aware of the employee's disability and an accommodation has been requested, "the employer must discuss with the employee whether there is a reasonable accommodation that will permit him to perform

---

intent of nonrenewal were acting with discriminatory or retaliatory motive—nor has sufficient evidence of pretext been presented to the Court that would otherwise rebut the legitimate, nondiscriminatory basis of the contract nonrenewal.

his job. Both the employer and the employee must cooperate in the interactive process in good faith." *Id.* at 980; *but see Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) ("The ADA seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations.").

A district court's reasonableness assessment under the third element must be "highly fact specific"—asking whether the accommodations afforded were aimed to reasonably "balance[e] the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). The Seventh Circuit has recently reiterated that a reasonable accommodation "enable[s] the employee to perform the essential functions of the job." *Bourke v. Collins*, No. 24-2221, 2025 WL 1862989 *3 (7th Cir. July 7, 2025) (citing *Swain*, 41 F.4th at 898). In other words, the employer "does what is necessary to allow the employee to work in reasonable comfort." *Id.* (citing *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012)). Although reasonable accommodations are all about enabling employees to work, it remains "an employer's prerogative to choose a reasonable accommodation." *See Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000); *see also Bourke*, No. 24-2221, 2025 WL 1862989, at *3 (citations omitted).

In opposition to summary judgment on these counts, Kavelman argues that multiple disputes of material fact exist as to the set of accommodations afforded by the City—including whether Welch "denied [Kavelman's] requests to work from home," and whether the full scope of the accommodations provided were "per-se unreasonable" under the circumstances of the ongoing COVID-19 pandemic. (Doc. 75 at 16–18). In taking

the second argument first, the Court finds Kavelman's invocation of *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635 (7th Cir. 2023) unhelpful under the present facts.[8]  Unlike in *Kinney*, it is not relevant to the Court's inquiry whether Kavelman had sufficiently demonstrated that she could perform her essential duties in a fully remote mode. *Id.* at 645–46 ("The parties and district court frame the main issue in this case as whether working in person was an essential function of Kinney's job."). But a relevant touchpoint relied upon in that case—and others preceding the COVID-19 pandemic—remains well-taken: "[T]echnological advances have made working from home more feasible, so that employers cannot rely on an automatic presumption working from home is unreasonable." *Bilinsky v. American Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019).  Even so, the facts of this case do nothing to suggest that the role of City Administrator is unsustainable or unreasonable as-performed in a remote manner. The City does not make an assertion to the contrary, nor does the record evidence reasonably suggest that Kavelman was forced to return to fully in-person working conditions at any time between her documented request for disability accommodations and the notice of contract nonrenewal—from July 2020 to March 2021.

As to the first purportedly-material issue that Kavelman suggests remains outstanding, the Court finds no difference in whether Welch initially denied the July 2020

---

[8] In *Kinney*, the Seventh Circuit held that a reasonable accommodation of an employee's anxiety disorder and related inability to wear a face mask, as a COVID-19 precaution, would have allowed that employee to fulfill the essential in-person duties as the director of imaging services for her employer-hospital without endangering herself and others. Further, the requested accommodation by the employee to work remotely would have allowed her to avoid essential supervisory and liaison tasks that required being in-person, moving through the department, and interacting with other healthcare staff.

request or not. Ultimately what is reserved for the Court's inquiry is whether the City sufficiently engaged in an interactive process and the resulting set of disability accommodations offered to Kavelman are reasonable under applicable standards.

The Court tracks the evolution of this purportedly material dispute across the briefings—observing that the City first asserts in the motion that Welch did not deny the July 2020 request for accommodations. (*See* Doc. 71 at 8). For example, the City contends that: "Welch told [Kavelman]to work from home when she needed to and come into the office when she needed to . . . [and that he] allowed [Kavelman] the flexibility to come into the building when she felt comfortable and to work from home when she felt comfortable." (*Id.*).

In responsive briefing, Kavelman attempts to rebut these fact-statements with her own—suggesting that material dispute remains because Welch gave inconsistent responses to her requests to work from home in or around the July 2020 request for remote accommodations, "telling her that she could work from home while also telling her she had to return to office." (Doc. 75 at 8). Kavelman then provides Additional Statement of Fact #13—asserting that: "[o]n or around July 9, 2020, Mr. Welch refused Kavelman's request to work from home and told her she needed to come into the office because Peggy Bateman, the City Clerk, and the individuals in her office, were required to work in the office." (Doc. 75 at 11, *citing* Doc. 75-1 ¶ 15).

And in the reply brief, the City notes that Kavelman's Additional Statement #13 appears to concede that Welch's initial denial of the July 2020 request for accommodations is "undisputed and immaterial . . . because it does not render the

accommodations provided to [Kavelman] as inadequate or unreasonable when she was working in the office during her tenure as the city administrator." (Doc. 76 at 5).

On review of these arguments under the ADA-framework, the Court observes that even if Welch initially denied the July 2020 accommodations, there lacks any showing of an outstanding material question that goes towards proving the elements of Kavelman's claims for failure to reasonably accommodate. The ultimate issue is not the reasonableness of Welch's purported denial of the July 2020 request for remote work, but whether the set of accommodations *actually offered* to Kavelman by the City was reasonable to address the needs of her disability so that she could perform her duties as required of her.

Engaging with the reasonableness inquiry under the ADA-framework in this case, the Court finds in favor of the City—determining the accommodations as offered to Kavelman were reasonable to address her disability such that she could perform her role and duties as City Administrator. On that issue, the Court finds no material dispute of fact remains that would warrant a jury trial on these counts, *see Waldridge*, 24 F.3d at 920, because the City offered a set of accommodations to Kavelman containing "reasonable alternatives" to fully in-person work conditions that "reasonably addressed" her disability and vulnerable health status during the COVID-19 pandemic. *See Bourke*, No. 24-2221, 2025 WL 1862989, at *3 (citing *Yochim v. Carson,* 935 F.3d 586, 591 (7th Cir. 2019) (holding that several alternative accommodations were reasonable because they "reasonably addressed" the disabled plaintiff's needs)).

38

The record shows that upon receipt of the request for disability accommodations in July 2020, Welch spoke with Kavelman—engaging an "interactive process" to determine the appropriate set of accommodations so that she may continue to perform her work for the City in a comfortable and safe manner. Courts focus on the resulting accommodation, not the process. *Cf. Conners*, 984 F.3d at 1262 ("[B]ecause the interactive process is not an end in itself, we have repeatedly held that the mere failure to engage in the process cannot give rise to a claim for relief.").

The Court need only approach the undisputed facts in the record to observe that the extent of this collaboration between Welch and Kavelman was sufficient under the ADA-framework. Most notably, that collaboration led to the provision of Kavelman's disability accommodations exactly-as-expressed in the July 2020 email. Representing the only documentary evidence of Kavelman's request for such accommodations, that email provided the extent of her disability and was supported by a letter from her oncologist—therein recommending that the City accommodate a hybrid model of work for Kavelman and provide for as much remote work as feasible to curb the risk of COVID-19 infection. (*See* Doc. 71-7, Ex. 6).

No evidence shows that Kavelman even articulated to Welch that she was unhappy with the City's accommodations as offered, let alone that her July 2020 request for accommodations is somehow distinguishable from what was actually offered to her. Nor is there evidence of a requested amendment by Kavelman at any time between July 2020 and March 2021. What the record does show, however, is that Welch allowed Kavelman to work from home as much or as little as needed—providing her with the ultimate discretion to

choose her preferred mode of work: in-person, remote, or a hybrid-model. (*See* Doc. 71-1 at 138; *see also* Doc. 71-4 at 90). He allowed her to select meetings to attend in-person or electronically by videoconference so that she could remain remote when she preferred. (*Id.*). And when Kavelman returned to the City Hall for in-person work at her discretion, Welch advised that she keep the door closed to limit contact with other individuals to mitigate risk of COVID-19 infection. (*See* Doc. 71-1 at 139–41; *see also* Doc. 71-4 at 83–84). The parties also agree that Welch informed other civil servants and employees to limit contact with Kavelman at City Hall by keeping their distance while she was in the building. (*Id.*). None of this evidence suggests Welch demanded or forced Kavelman to return prematurely. Nor does it suggest that Kavelman requested to engage in any additional collaboration to amend or otherwise expand what had already been approved by Welch and the City.

Kavelman's own representations show this.  In her July 2020 email, she represented that she wanted to return to an in-person work model as soon as possible, so long as that return was planned in a safe and responsible manner. (*See* Doc. 71-7, Ex. 6; *see also* Doc. 71-1 at 129–130;  Doc. 71-4 at 82). Kavelman "love[d] her job" and wished to return to City Hall as soon as feasible. (*See* Doc. 71-2 at 135; Doc. 71-4 at 83, 85). Further, as represented in her September 2024 deposition, Kavelman provides no recollection one way or another as to whether she asked Welch if she could work from home on a fully remote basis after July 2020, or if she asked to do so by email. (*See* Doc. 71-2 at 136:8–141:22) ("I'm thinking I did, but I cannot – I can't recall."). Nor were any complaints documented or otherwise

brought to the City Council after her return to the workplace under a hybrid model of work. (*See* Doc. 71-1 at 200).

Nor is there sufficient evidence to show that the provision of Kavelman's accommodations were revoked, rescinded, or otherwise dishonored between July 2020 and March 2021. Although the Court does not weigh credibility of testimony on summary judgment, no admissible evidence contradicts Welch's testimony as to the substance of the City's broad provision of disability accommodations in this case:

> **Counsel Gougis (Q)**: [D]id you allow Miss Kavelman to come in one day a week . . .
>
> **Tracy Welch (A):** I allowed –
>
> **Q**: Or four days a week?
>
> **A:** I allowed Miss Kavelman the flexibility to come into the building when she felt comfortable and to work from home when she felt comfortable. That was—that was part of the accommodation discussions—that we had.
>
> **Q**: At no point during the discussion with Miss Kavelman did you say that quote, I need you here, or anything to that effect?
>
> **A**: I don't recall having that conversation with her or making those statements.
>
> **Q**: So, if Miss Kavelman had chosen to work one day a week in the office would that have been acceptable to you?
>
> **A**: Yes.
>
> **Q**: If Miss Kavelman worked completely remotely and did not come into the office in person would that have been acceptable to you?
>
> **A**: Yes.
>
> **Q**: Other than being allowed to work remotely, were there any other accommodations that were discussed?
>
> **A**: Only the ones that I said previously regarding when she chose to be in the building, the actions that I that we agreed—that she should take, and then the actions that I took to ensure that others stayed away from her.

(*See* Doc. 71-4 at 88:16–90:14).

At bottom, there is no issue of material fact for a jury to resolve on these counts. Absent representations in Kavelman's sham-affidavit, there is no documentary or testimonial evidence to rebut or even suggest that Welch's assertions are inconsistent with the record, or that the City's set of accommodations were unreasonable or inconsistently applied during the period of tenure that followed her request. Even if the record suggested that Kavelman did not get every accommodation she wanted, or the degree at which she wanted it, an employer must only provide a reasonable accommodation—not a perfect one. *Jay*, 233 F.3d at 1017 ("[A]n employer is not required to provide the particular accommodation that an employee requests."). The record lacks evidence to suggest that Kaveman's discretion in performing her role was impeded or otherwise revoked—whether that preference was fully remote, fully in-person, or a hybrid-model. *Cf. Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019) (finding "[a]bsent some change in circumstance, an employer may not rescind an accommodation simply because it is inconvenient or burdensome").

For these reasons, the Court finds that the set of accommodations provided to Kavelman were reasonable under the controlling ADA-framework. Kavelman has failed to demonstrate sufficient evidence to show the disability accommodations were unreasonable, *Sansone*, 917 F.3d at 979, and no issue remains on these counts that would warrant a jury trial. The City's motion is, therefore, granted as to Counts II, V, and VIII.

## III.    Retaliation Claims

42

Kavelman's SAC also contains a set of retaliation claims grounded under applicable provisions of the RA, IHRA, ADA and EPA. (*See generally*, Doc. 24). Bifurcating her theories of retaliation, Kavelman first contends that the City unlawfully retaliated in response to her request for disability accommodations under Counts III, VI, and IX. (*See* Doc. 24, ¶¶30–32, 38–40, 46–48). Next, under Count XI, Kavelman claims that the City retaliated unlawfully to her requests for an increase in pay. *Id.*, ¶¶58–61).

District courts apply the same elements used in Title VII and the ADA cases when assessing retaliation claims brought pursuant to the RA, IHRA, and EPA. *Compare* 42 U.S.C. § 2000e-3(a), *with* 42 U.S.C. § 12203 (presenting identical elements between Title VII and ADA); *see Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) (using Title VII retaliation cases in evaluation of an ADA retaliation claim); *see also Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 705 (7th Cir. 2024) (evaluating both Title VII and IHRA retaliation claims under identical elements); *Rongere v. City of Rockford*, 99 F.4th 1095, 1104 (7th Cir. 2024) (applying the federal framework of Title VII to retaliation claims under the EPA and IHRA); *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016) (federal framework applied to IHRA retaliation claim); *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (federal framework to EPA retaliation claim).

Kavelman must show that: (1) she engaged in a statutorily protected activity; (2) a materially adverse action was taken by the employer; and (3) a causal connection between the two. *See Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 997 (7th Cir. 2024) (citing *Abebe v. Health & Hosp. Corp. of Marion County*, 35 F.4th 601, 607 (7th Cir. 2022)). As the first and second elements are uncontroverted in the present case, Kavelman must only

demonstrate that "the record contain[s] sufficient evidence for a reasonable factfinder to conclude that retaliatory motive caused the materially adverse action." *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). The key question is not whether a reasonable juror must conclude, but *could conclude* that there is a "causal-link" between the first and second elements. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019); *see also Ortiz*, 834 F.3d at 765–66 (whether the record would "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor" caused the adverse action or discharge).

There appears nothing "akin to an admission" by the City that would suggest direct evidence supports a finding of retaliation on either of Kavelman's theories. *See Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012) (citing *O'Leary*, 657 F.3d at 630). She is, therefore, left with circumstantial evidence to show that a reasonable jury could create an inference of retaliation on either of her theories. *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009). Relevant circumstantial evidence in support of such an inference may include "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski*, 937 F.3d at 924.

### A.  Request for Accommodations (Counts III, VI, and IX)

Under the first set of retaliation claims grounded in the RA, ADA, and IHRD, Kavelman falters on the third element of causation. *See Li*, 110 F.4th at 997.  There appears no evidence to suggest that members of the City Council, besides Welch, were even aware that Kavelman had requested accommodations for her disability in July 2020. *See Durkin*

44

*v. City of Chi.*, 341 F.3d 606, 615 (7th Cir. 2003) ("An employer cannot retaliate if there is nothing for it to retaliate against."). In fact, the July 2020 email represents that Kavelman did not want the City Council to be notified as to her requested accommodations. (*See* Doc. 71-7, Ex. 6) ("Please talk with me when you get a few minutes today or tomorrow before you discuss this with anyone from the City Council. I don't want anyone thinking I want special privileges.").

Although one cannot infer retaliation from a decisionmaker's knowledge alone, "[a] valid retaliation claim requires that the decisionmaker know of the protected activity." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 633 (7th Cir. 2020). This is damning to Kavelman's demonstration of a causal-link under the third element. *Cf. King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (concluding "no support for a claim of retaliation" because plaintiff failed to show that the decisionmaker "was aware of her protected activity or was involved in the later actions."); *see, e.g., Cervantes v. Ardagh Grp.*, 914 F.3d 560, 565 (7th Cir. 2019) ("[E]ven if Mr. Cervantes has alleged that he engaged in protected activity, his retaliation claim still fails because he conceded that none of his supervisors at Ardagh were aware of his complaints").

Nor is there an issue of timing that would reasonably support an inference of retaliation. *Lang v. Illinois Dep't of Child. & Family Services,* 361 F.3d 416, 419 (7th Cir. 2004) ("Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is other evidence that supports the inference of a causal link.").  Here, it remains undisputed that Kavelman requested—and her doctor recommended—that she work from home in a hybrid-model after the July

2020 timeframe. (Doc. 71-7, Ex. 6). Approximately nine (9) months later, in March 2021, Kavelman was provided notice of the nonrenewal of her contract. Although no "bright-line numeric rule" exists, a gap of nine-months is well beyond what the Seventh Circuit has deemed suspect to support a claim of retaliation. *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (finding one month short enough to reinforce inference of retaliation). And as articulated at length above, the City Council had several, legitimate reasons to support the nonrenewal—such as Kavelman's general disorganization, loss of monetary benefit to the City from botched grant-applications, among other factors. (*See* Docs. 71-7, Ex. 10 at 16:30, 19:30, 20:57, 23:00, 23:18, 23:49, 24:11). These events cannot be ignored, as they qualify as "significant intervening event[s]" which tend to undercut persuasive value afforded to arguments on timing. *Davis v. Time Warner Cable of Se. Wis.*, 651 F.3d 664, 675 (7th Cir. 2011).

Again—as it did in the context of Kavelman's discrimination claims—the Court acknowledges that Tibbs' affidavit, and the undisputed statement of fact represented in the response. (Doc. 75-2 at 1). Tibbs attested that she spoke with Welch "shortly after" Welch's assumption of "acting mayor" that concerned Kavelman's employment status and, during the conversation, she expressed that Welch should not get rid of Kavelman "because she was very important." (*Id*.). Welch responded that Kavelman "has been very good, but [she] has been a very sick woman." (*Id*.). Still, without more, this statement is presented without enough context to provide a reasonable inference of causation

between Kavelman's requested accommodations and the City's nonrenewal of her contract.[9]

And, in any event, the City Council retained a majority consensus on the nonrenewal of Kavleman's employment contract on a legitimate, nondiscriminatory basis without the need of Welch's vote to do so. (*See* Doc. 71-7, Ex. 10 at 1:29:40–1:30:15). Thus, despite any suggestion that he held animus towards her in a supervisory role, Welch was not in a unilateral position to "terminate" Kavelman. The Seventh Circuit suggests that for a nominal or non-decision-maker's influence to place an employer's adverse actions at issue in the discrimination and retaliation context, the employee must possess so much influence as to basically be herself the true "functional[ ] … decision-maker." *Little v. Ill. Dept. of Revenue,* 369 F.3d 1007, 1015 (7th Cir. 2004). This nominal decision-maker must be nothing but the functional decision-maker's "cat's paw." *Shager v. Upjohn Co.,* 913 F.2d 398, 403 (7th Cir. 1990). No evidence reasonably suggests that Welch controlled or otherwise improperly forced the hand of the City Council to take adverse action against Kavelman. No reasonable juror could infer the existence of the City's retaliation as the cause for the nonrenewal.

---

[9] Once more engaging in *arguendo*, the Court notes that it would come to the same conclusion if all the evidentiary rulings provided in Section II were made in favor of Kavelman's positions and such evidence was admitted for purposes of summary judgment on the retaliation claims associated with her requested accommodations. If Welch was the sole decision-maker in the nonrenewal of her contract, those facts as represented through Kavelman's Additional Statements of fact would render summary judgment in favor of the City inappropriate. However, Kavelman has not presented evidence showing that the six (6) aldermen comprising the City Council who expressed their intent of nonrenewal were acting with discriminatory or retaliatory motive—nor has sufficient evidence of pretext been presented to the Court that would otherwise rebut the legitimate, nondiscriminatory basis of the contract nonrenewal.

Additionally, although Kavelman asserts that she previously "requested to Mr. Welch that she be provided with an administrative assistant" and that former employees "Johnson and [Mahrt] were each provided with administrative assistants," such undisputed facts are immaterial in lending support to the causal-link element on her retaliation claims. (Doc. 75 at 13; *see also* Doc. 76 at 8–9). Importantly, Kavelman does not present arguments in her response brief that would suggest her several requests for administrative support staff shares a nexus with her formal request for disability accommodations as documented for the first time in the July 2020 email. Nor are there representations of fact that her requests for administrative support staff were otherwise adjoined with the interactive process resulting in the City's accommodations as they were afforded. The City would, of course, not be required to hire additional staff to accommodate Kavelman. *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 680 (7th Cir. 2010) ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee.); *see also EEOC v. Charter Commc'ns, LLC*, 75 F.4th 729, 742 (7th Cir. 2023) (Employers are "not required to bend over backwards to accommodate a disabled employee.).

But even if the Court were to bundle these requests for administrative support as evidence of disparate treatment, or in support of a showing of pretextual nonrenewal of her contract, Kavelman still fails to demonstrate evidence that the role reasonable required such assistance, or that the previous employees who held the role are properly considered as "comparators" in this litigation. Putting aside legitimate critiques as to the adequacy of foundation in support of her assertions on this point, *see generally* Fed. R.

Civ. P. 602, the Court remains unpersuaded that the existence of prior administrative support staff in assistance of the City Administrator role useful in the adjudication of any material controversy implicated in this litigation. Indeed, without a favorable comparator-finding that links Johnson and Mahrt to Kavelman, the prior existence of that administrative support staff provides no assistance to the resolution any claim elements at issue here—especially in the context of Kavelman's disparate treatment and retaliation counts. As additional foundation to the undisputed facts of record, the presence of administrative support staff is speculated to have varied across the tenures of Johnson, Mahrt, and Kavelman:

> **Counsel Gougis (Q)**: Okay. During the time that Clay Johnson was city administrator did he have any administrative staff?
>
> **Tracy Welch (A)**: Yes, I believe that's accurate.
>
> **Q**: Okay. And that office of the city administrator during the time that Beth Kavelman was hired as city administrator, was there any administrative staff assigned to assist her?
>
> **A**: There was not. When Miss Vineyard left the City she was not replaced.
>
> **Q**: Okay. And why was that position not replaced?
>
> **A**: I don't recall.
>
> **Q:** During Miss Kavelman's tenure as city administrator did the mayor have an administrative staff assigned?
>
> **A**: No.
>
> **Q**: During Bob Mahrt's tenure as city administrator was there administrative staff assigned to assist him?
>
> **A**: There was not.

(Doc. 71-5 at 23:3–24:2).

Again, although no credibility determinations are made on summary judgment, Welch's testimony provides useful context for the comparator assessment that follows in the disposition of Kavelman's EPA claims. As articulated therein, only ambiguous or otherwise inadmissible demonstrations of evidence support the suggestion that either Johnson or Mahrt performed similarly situated roles as Kavelman—despite identical job titles. The outstanding questions as to whether Johnson or Mahrt were assisted in their roles and duties with administrative support staff does not tend to prove or disprove any elements of any claim or defense at issue in the City's motion—including whether Kavelman was retaliated against in her request for administrative support in her role.

For these reasons, Kavelman has failed to carry her burden to establish a *prima facie* case of retaliation as to her request for disability-accommodations—neglecting to demonstrate that a reasonable factfinder could find a causal-link between the City's retaliatory motive and the nonrenewal of her employment contract on this basis. *Lesiv*, 39 F.4th at 911; *see also Li*, 110 F.4th at 997. The City's motion is, therefore, granted as to Counts III, VI, and IX.

### B. Request for Increased Pay (Count XI)

As for the singular retaliation count brought under the EPA, Kavelman again falls well-short of demonstrating sufficient evidence such that a reasonable juror could infer the existence of a causal-link between her request for increased pay and the nonrenewal of her employment contract as City Administrator. *Li*, 110 F.4th at 997.

Kavelman provides no citation in demonstrative support of Count XI. Although the parties do not dispute that Kavelman made statements regarding the pay

discrepancies to members of the City Council during various executive sessions, these are vague assertions without specific dates or times proffered in support of the merits. (*See* Doc. 71-2 at 201). Nor would these statements alone support the survival of this claim. Kavelman expressly acknowledges that no member of the City Council ever vocalized that her pay scale would be negatively impacted from her complaints related to pay-discrepancies. (*Id.* at 202:16–203:24).

Nor will the Court scour evidence in the record to further benefit Kavelman's undeveloped theory on this claim, as it "should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity" within the operative legal argument. *See Waldridge,* 24 F.3d at 922 ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."); *see also Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). As only inadmissible or otherwise ambiguous demonstrations of evidence on this claim have been presented, the Court finds that no reasonable juror could infer a causal-link between Kavelman's requests for pay increases and the nonrenewal of her employment contract.

For these reasons, Kavelman fails to carry her burden in establishing a *prima facie* case of retaliation as to her request for an increase in pay—neglecting to demonstrate that a reasonable factfinder could find a causal-link between the City's retaliatory motive and the nonrenewal of her employment contract on this basis. *See Lesiv*, 39 F.4th at 911; *see also Li*, 110 F.4th at 997. The City's motion is, therefore, granted as to Count XI.

## IV.    Unequal Pay Claim (Count X)

Kavelman brings her unequal pay claim under the EPA—contending that she was paid less than her male counterparts for equal work. (Doc. 75 at 21–23). Under the EPA, "[n]o employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ." 29 U.S.C. § 206(d)(1).

To establish a *prima facie* case for a violation of this provision under the EPA, the employee must demonstrate that: (1) different wages are paid to employees of the opposite sex; (2) the employees do equal work that requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. *Markel v. Board of Regents of the Univ. of Wisconsin Sys.,* 276 F.3d 906, 912–13 (7th Cir. 2002). "The jobs that are compared must be substantially equal, based on actual job content and performance-not job titles, descriptions, or classifications." *Id.* at 913. The terms "equal skill, effort, and responsibility" constitute separate tests, each of which must be met to establish a *prima facie* case. *Stopka v. Alliance of Am. Insurers,* 141 F.3d 681, 686 (7th Cir. 1998).

District courts are encouraged to engage with a "flexible, common-sense" examination of several factors in assessment of these three elements. *Coleman*, 667 F.3d at 841 (citations omitted). Typically, courts ask whether the employees in question: "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other

qualifications—provided the employer considered these latter factors in making the personnel decision." *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008) (citations omitted).

The Court finds that Kavelman fails to satisfy her burden in establishing a *prima facie* case as to her unequal pay claim. The City concedes that both Mahrt and Johnson were paid a higher monetary wage for the City Administrator role, so Kavelman easily meets the first element of this inquiry. (Doc. 71 at 26). Mahrt was paid a base compensation of $47.25 per hour, and Johnson earned a salary of $70,542.50 per his contractual terms with the City. (Doc. 71-4 at 52, 54–55). Under the second and third elements, however, Kavelman has not sufficiently established that her role required "equal skill, effort, and responsibilities" as performed by Mahrt or Johnson; nor has she shown that these duties "involved a common core of tasks," or that a "significant portion of the jobs [were] identical." *Stopka v. All. of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998).

As for identical language used in the contracts of Kavelman and Johnson, the language used in these employment contracts is more descriptive of the general role than it is indicative of *actual work* as performed under the role. (*Compare* Doc. 75-3 *with* Doc. 75-4). Courts are typically guided by the similarities between *actual* job performance in these analyses—not job titles, descriptions, or classifications. *Markel*, 276 F.3d at 913. As for Mahrt, Kavelman provides no evidence of similarities-in-contract or otherwise on this point—neglecting to demonstrate any evidence outside of her own speculative affidavit that would warrant a favorable comparator finding between these three employees.

Kavelman's showing simply does not support "enough common factors … to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). Discussed at length in the evidentiary rulings, Kavelman's suggestion that she performed the duties of the City Administrator during her tenure as mayor are baseless, grounded only by her own speculation. The record evidence does show, however, before she was hired that the base pay for the City Administrator was discussed and set by the City Council. (*See* Doc. 76 at 17, *citing* Doc. 71 ¶¶ 13–16). It is further undisputed that Kavelman's starting salary is the same salary that was presented to *all applicants* for the position at the time of her application and onboarding. (*Id*.). The City Council simply did not want to spend the amount of money that was paid to Johnson when Kavelman assumed the role — determining that the money paid to Johnson was too high for the associated workload. (Doc. 71-4 at 49; *see also* Doc. 71-5 at 30-31). No record evidence reasonably suggests that the City Council acted with discriminatory motive or animus in making that decision; instead, the record suggests that the City Council set the base-salary of the position before Kavelman was offered the role. (*Id*.).

At bottom, the record is void of evidence that would ground Count X beyond mere speculation proffered by Kavelman's affidavit. In an unequal pay claim, "the challenger must prove that he or she was treated disparately from those similarly situated." *Srail v. Village of Lisle*, 588 F.3d 940, 944–45 (7th Cir. 2009). Outside of bare assertions, the record is bereft of evidence suggesting that Mahrt or Johnson's *actual* job duties were comparable to those of Kavelman, and there is no direct or indirect evidence to reasonably conclude

54

that the City Council acted with gendered animus towards Kavelman when setting the baseline salary for the City Administrator role. Although the determination of whether a comparator is similarly situated is one typically reserved as "a question for the fact-finder," summary judgment is appropriate here because no reasonable fact-finder could determine that Kavelman has met her burden on Count X. *Id.* at 945.

For these reasons, the Court finds Kavelman has failed to carry her burden to establish a *prima facie* case as to her unequal pay claim—neglecting to demonstrate sufficient evidence to reasonably suggest that prior roles were comparable with her own. *Markel,* 276 F.3d at 912–13.  The City's motion is, therefore, granted as to Count X.

## CONCLUSION

For the reasons provided herein, the City's motion for summary judgment (Doc. 71) is hereby **GRANTED** on all counts. Judgment shall be entered in favor of the City. This matter is terminated.

Entered: July 14, 2025.

       /s/ DOUGLAS J. QUIVEY
       UNITED STATES MAGISTRATE JUDGE